UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-CV-20561-JLK

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

vs.

JONATHAN R. CURSHEN,
MICHAEL S. KROME,
DAVID C. RICCI,
RONNY MORALES SALAZAR,
ROBERT L. WEIDENBAUM,
ARIAV "ERIC" WEINBAUM, and
YITZCHAK ZIGDON a/k/a IZHACK ZIGDON,

    Defendants.
_____/

## OPINION AND ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION AND AGAINST DEFENDANTS ZIGDON AND WEINBAUM

**THIS MATTER** comes before the Court upon Plaintiff Securities and Exchange Commission's ("SEC") Motion for Summary Judgment (DE #70), filed February 24, 2012. Therein, Plaintiff SEC moves for summary judgment on all claims asserted against Defendant Yitzchak Zigdon ("Zigdon") and Defendant Ariav Weinbaum ("Weinbaum"). The Court is fully briefed in the matter[1] and proceeds with the benefit of oral argument.[2] For the following reasons, the Court finds it must grant Plaintiff SEC's Motion for Summary Judgment as to liability.

---

[1] Defendant Weinbaum, proceeding *pro se*, filed a Response (DE #108) on April 27, 2012 and Defendant Zigdon, represented by counsel, filed his Response (DE #113) on April 28, 2012. The SEC replied on May 5, 2012 (DE #123).

[2] The Court heard oral argument on May 22, 2012. *See* Minute Entry (DE #151).

1

## I. BACKGROUND

This is a civil SEC case alleging stock and market manipulation. Plaintiff brings this action pursuant to the authority conferred on it by Securities Act Section 20(b) and (c) and Exchange Act Section 21(d) and (e). *See* 15 U.S.C. §§ 77t(b) & (c), 78u(d) & (e). Defendants include a business owner, stock traders, an attorney, and an accountant, all of whom are accused, both civilly and criminally, of perpetrating a fraudulent "pump-and-dump scheme"[3] in the common stock of a fictitious company, C02 Tech Ltd.

On February 18, 2011, Plaintiff SEC filed the above-styled action, alleging violations of various securities laws. (*See* Compl., DE #1). Default, consent, and summary judgments have been entered against all Defendants, except for Weinbaum and Zigdon.[4] As against Defendants Weinbaum and Zigdon, Plaintiff SEC alleges violations of Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5, (Count I); Sections 17(a)(1), (2) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(1), (2) & (3), (Count II); and Sections 5(a) and (c) of the Securities Act, 17 U.S.C. § 77e(a) & (c), (Count IV), seeking damages and injunctive relief. (Compl., DE #1). More specifically, Plaintiff SEC alleges that Defendant Weinbaum, a businessman, and Defendant Zigdon, an accountant, worked together to perpetrate the stock manipulation scheme by establishing a business relationship with Red Sea Management, Ltd., a Costa Rican asset protection company run by co-Defendant Jonathan Curshen, and coordinating a false media campaign for the C02 Tech stock. (*Id.* ¶¶ 14–15). Before the Court now is Plaintiff

---

[3] "Pump-and-dump" is a form of stock fraud that involves artificially inflating the price of an owned stock through false and misleading positive statements, in order to sell the cheaply purchased stock at a higher price. Once the operators of the scheme "dump" their overvalued shares, the price falls and investors lose their money.

[4] Michael S. Krome, David C. Ricci, and Robert L. Weidenbaum settled with the SEC without admitting or denying the allegations. (DE #39; DE #54; DE #42). Ronny Morales Salazar did not answer the SEC's complaint and had a default judgment entered against him. (DE #61). Finally, this Court granted the SEC's motion for summary judgment against Jonathan Curshen after he was convicted of conspiracy to commit securities fraud in a related

SEC's Motion for Summary Judgment against Defendants Zigdon and Defendant Weinbaum. The following facts are undisputed.[5]

## II. UNDISPUTED MATERIAL FACTS

This matter concerns the sale of the common stock of C02 Tech, a limited private company incorporated in the United Kingdom on January 24, 2007. (DE #70-6, at 142). C02 Tech maintained a registered office at 95 Wilton Road, Suite 3, London, England. (DE #70-6, at 144; Feb. 2, 2007 screenshot of http://www.co2-tech.contact_us.html, DE #70-6, at 127). C02 Tech's manufacturing and research development facility was supposedly in Israel, on property owned by a subsidiary named Shamar Industries, Inc. (See Declaration of Israel Securities Authority ("ISA Decl."), DE #70-3, ¶ 9). According to C02 Tech's website, Helga Schotten was the company's president, and Jacob Froynd was Chief Executive Officer. (Feb. 2, 2007 screenshot of http://www.co2-tech.contact_us.html, DE #70-6, at 127).

In actuality, C02 Tech's address listed at 95 Wilton Road, Suite 3, was a mail drop rented from Steinberg & Partners Business Consulting Corporation. (See App. Ex. 19, DE #70-6, at A131-35). In addition, according to Israeli officials, Shamar Industries was never listed with Israel's official Companies Registrar. (ISA Decl. ¶ 9). Further, and upon an extensive search, Israeli authorities could not locate C02 Tech's purported manufacturing facility. (Id.)

With regard to C02 Tech's corporate officers, Froynd, the company's CEO, had not traveled outside of Israel since November 1, 2003, and its President, Schotten, had not traveled outside of Israel since May 18, 2004. (ISA Decl. ¶ 6). According to Israeli authorities, Ms.

---

criminal case. (DE #161; Case No. 11-20131-CR-RWG).

Schotten was the 72-year-old mother of Froynd. (*Id.*).

In 2006, Defendants Weinbaum and Zigdon asked Defendant Michael Krome, an attorney licensed in New York, to find a public shell corporation for purchase, so that Defendants Weinbaum and Zigdon could facilitate an eventual merger of the shell corporation and C02 Tech. (Krome Decl. ¶ 3, DE #70-4). In early October 2006, Defendant Weinbaum wire transferred approximately $82,000 to Defendant Krome's escrow account as part of the money needed to purchase a check in the amount of $120,000 to be deposited in Krome's escrow account. (*Id.* ¶ 4). This additional money made up the balance of the purchase price and incidental costs related to the purchase of a shell company. (*Id.*).

While Defendant Krome was looking for a shell company for purchase, Defendant Weinbaum met with Defendant Jonathan Curshen in late October or early November of 2006 to discuss the opening of a brokerage account at Red Sea Management Ltd., an asset protection company owned and operated by Defendant Curshen and located in San Jose, Costa Rica. (Jan. 23, 2012 Joseph Francis Direct, DE #70-6; Nov. 7, 2006 Email from Jonathan Curshen, DE #70-6, at 68). Around the same time, in late 2006, Defendant Weinbaum hired Defendant Robert Weidenbaum, a stock promoter in the United States, to distribute press about C02 Tech to increase its public exposure and to eventually organize match buy and sell orders of C02 Tech stock. (Jan. 18, 2012 Weidenbaum Direct 62:8–69:25, Case No. 11-CR-20131-RWG, DE #70-7). Specifically, Defendant Weidenbaum arranged for "buy-side support" for C02 Tech stock from three stock promoters based in Miami, Florida: Ryan Reynolds, Timothy Barham, and Nathan

---

[5] The facts are derived from Plaintiff SEC's Statement of Material Facts and the record exhibits referenced therein. (DE #70-2). Defendants Zigdon and Weinbaum deny all of Plaintiff SEC's allegations, but are unable to point to any record evidence that reveals an issue of fact.

Montgomery (the "Reynolds Group"). (App. Ex. 59, at A383, 390–91). According to Defendant Weidenbaum, "buy-side support" meant that "[w]e would put in orders and buy orders at the same time that the news releases were being redistributed to the public to create an artificial demand for the security." (*Id.* at A366).

Soon thereafter, in December 2006, Defendant Krome located a shell company for sale: China Energy & Carbon Black Holdings, Inc. ("China Energy"), a public company in Nevada with no assets or revenues. (Declaration of Michael S. Krome ("Krome Decl."), DE #70-4, ¶ 5). On December 21, 2006, Krome used Defendant Weinbaum's escrow funds to purchase China Energy for $175,000. (*Id.* ¶ 6). On January 2, 2007, Defendant Krome filed information with Nevada's Secretary of State to change China Energy's name to C02 Tech Ltd. (*Id.* ¶ 8).

The following day, on January 3, 2007, Defendant Krome, at the direction of Defendants Weinbaum and Zigdon, filed a certificate of incorporation with Delaware's Secretary of State for a company called JB Investment Enterprises Ltd. (*Id.*). Subsequent to the January 3, 2007 incorporation of JB Investment Enterprises Ltd., Defendants Weinbaum and Zigdon sent to Defendant Krome a debenture note that stated as of October 1, 2006 C02 Tech owed a debt of $200,000 to JB Investment Enterprises Ltd. (*Id.* ¶ 9). The note further provided that in the event C02 Tech was unable to repay the note with interest to JB Investment Enterprises by January 1, 2007, the full amount due could be converted into shares of C02 Tech stock and issued to JB Investment Enterprises. (*Id.*). Defendant Krome knew the debenture note to be false, because it referred to a debt owed by C02 Tech to JB Investment Enterprises Ltd. prior to the existence of JB Investment Enterprises Ltd. (*Id.* ¶ 10).

The discussions between Defendant Weinbaum and Defendant Curshen about opening an

account at Red Sea continued in early January 2007, when Defendant Curshen and Defendant Weinbaum, along with their families, went on a ski trip in Whistler, Canada. (Jan. 19, 2012 Michael Bahar Direct 59:3, Case No. 11-CR-20131-RWG, DE #70-6). Michael Bahar, Defendant Weinbaum's brother-in-law, was present at a "small business meeting" in Whistler when Defendants Weinbaum and Curshen agreed that Defendant Weinbaum would sell C02 Tech stock through Red Sea. (*Id.* 82:16–20). Shortly thereafter, on January 9 and 10, 2007, Defendant Zigdon received emails from Lucia Shum, the office manager at Red Sea, about the necessary forms to open a brokerage account at Red Sea. (January 9, 2007 Email from Lucia Shum to Zigdon, DE #70-6, at A59). Around this time, Defendant Weinbaum also told Defendant Krome that a brokerage firm called Red Sea would be working on the C02 Tech transaction. (Krome Decl. ¶ 2).

Then, on January 16, 2007, at Defendant Weinbaum's request, Defendant Krome wrote a legal opinion letter to a stock transfer company, advocating for the release from the treasury of 22,500,000 shares of C02 Tech stock to MMTC & Co., without restrictive legend, as assignee of the October 2006 debenture note between JB Investment Enterprises Ltd. and C02 Tech. (Krome Dec. ¶¶ 9, 11; Jan. 16, 2007 Letter from Krome to OTC, DE #70-6, at 11–16). The letter vouched for the authenticity of the October 2006 debenture note between JB Investment Enterprises Ltd. and C02 Tech, as well as the transaction's compliance with the Uniform Commercial Code and the Securities Act of 1933. (Jan. 16, 2007 Letter). A certificate for 22,500,000 shares of C02 Tech stock was issued to MMTC & Co., and received by Sentry Global Securities, the brokerage branch of Red Sea. (Jan. 17, 2007 Email from Lucia Shum, DE #70-6, at 72; Jan. 9, 2012 Ricci Dep. 13:24–14:4; DE #70-6, at 17).

By the following week, at the urging of Defendant Weindebaum, a public media campaign was underway. (Jan. 18, 2012 Weidenbaum Direct 90:11–92:24). Defendant Zigdon's sister, Hila Zigdon Shtork, began to work on the graphics for the C02 Tech website. (Dec. 5. 2011 Hochman Dep. 56:10–21, DE #70-7). In addition, Defendant Zigdon asked Renee Hochman, the owner of a translation service in Tel Aviv, Israel, to edit the website, and Defendant Weinbaum also asked Bahar to review and make minor edits to the website. (*Id.* 55:24–56:2; Dec. 1, 2011 Bahar Dep. 39:1–8, DE #70-6).

The website published statements about C02 Tech's purported services and its research and development program:

> C02 Tech, a UK-based company, provides cutting-edge, sophisticated technologies, along with a full range of expert consulting and environmental products and services to businesses, industries and governments.
>
> . . .
>
> Through its multi-stage R&D program, the company has developed proprietary technologies, products and equipment for controlling and measuring atmospheric emissions, greenhouse gases and related systems for a wide variety of industries.

(Feb. 14, 2007 screenshot of http://www.co2-tech.com/index.html, DE #70-6, at 96). In addition, the website referred to C02 Tech's purported contracts and clients:

> C02 Tech's experts have been involved for over a decade in the research, development, design, manufacture, installation, operations and testing of numerous pollution control products and systems for industrial enterprises and government agencies all over the world.
>
> . . .
>
> it has extensive first hand experience with all major air pollution control equipment including air pollution control systems, removal of fine solid particles from gas/air units, evaporator units, reduced C02 emission units, etc.
>
> . . .

7

> C02 Tech fosters strong partnerships and alliances with leading environmental engineering companies and research institutions worldwide to develop manufacture and market high-quality instruments, systems and services to support its client's anti-global warming effort.

(Feb. 2, 2007 screenshot of http://www.co2-tech.com/company_profile.html, DE #70-6, at 120).

On January 25, 2007, the C02 Tech website went live. That same day, Defendant Weindenbaum's company, CLX & Associates, entered into a "consulting agreement" with C02 Tech, whereby CLX would provide investor relations for C02 Tech prior to the coordination of matched trades in exchange for $275,000.00. (Weidenbaum Direct 72:1–74:23). The next day, January 26, 2007, Red Sea began to sell C02 Tech stock into the public market. (Client Trade Report, DE #70-6, at 17).

In addition to the website, Zigdon worked with Hochman to translate and disseminate C02 Tech press releases regarding C02 Tech's purported business relationships and activities. (Hochman Dep. 17:6–26:16; Jan, 31, 2007 Email from Hocham to Yakubuv, DE #70-6, at 174). On January 30, 2007, C02 Tech issued a press release stating that "Boeing's interest has been captured by C02 Tech's new solution to reduce polluting gases emitted from airplanes at high altitudes," and, in the words of President Helga Schotten, that C02 Tech is "extremely proud to join the anti-global warming efforts of Boeing." (Jan 30, 2007 "C02 Tech to Join Boeing's Global Environmental Efforts" Press Release, DE #70-6, at 150). That day, Red Sea sold more than 5 million shares of the stock into the market. (Client Trade Report, DE #70-6, at 17).

The next day, C02 Tech issued another press release claiming that C02 Tech "will exhibit its new solution to reducing gaseous emissions [from] airplanes at high altitudes for Boeing's review." (Jan. 31, 2001 "C02 to Exhibit New Anti-Global Warming System Solutions for

Boeing's Review in Q2/2007" Press Release, DE #70-6, at 152). The press release quoted Schotten as saying that C02 Tech "intend[s] to collaborate with Boeing in testing this product after completion of our prototype in Q2/2007 so that Boeing may be the first aircraft manufacturer to implement the new anti-global warming system and succesfully [sic] reduce air pollution." (*Id.*). The press release concludes with Schotten's statement that, "We are very pleased with Boeing's encouragement of our work on this innovative product . . . ." (*Id.*).

Less than one week later, on February 5, 2007, Boeing sent a letter and email to Schotten "demand[ing] that C02 Tech immediately cease its use of the Boeing name and trademark in any press release issued by or on behalf of C02 Tech. Additionally, we demand that C02 Tech cease and desist any action that implies any association between Boeing and C02 Tech." (Feb. 5, 2007 Letter from Boeing to Schotten, DE #70-6, at 155–56). The next day, Boeing received an email from Schotten apologizing for "any impression of an active association or affiliation between Boeing and C02 Tech." (Feb. 6, 2007 Email from Schotten to Boeing, DE #70-6, at 156).

At the same time that CO2 Tech was issuing false statements, its stock was being artificially inflated. In the pre- and early market hours of January 30, 2007, the sell-side (Weinbaum, Bahar, Ricci, and Salazar) and the buy-side (the Reynolds Group) engaged in matched orders of C02 Tech stock at increasing prices. For example, at 8:33 a.m., a Red Sea account entered a sell order for 100,000 shares at $0.91 per share and at 8:40 a.m. entered a sell order for an additional 27,000 shares at $0.93 per share. (Declaration of Craig Miller, executed on February 22, 2012 ("Miller Decl."), DE #70-5, ¶¶ 3–4). Less than a minute later, the Reynolds Group bought the 127,000 shares at $0.94 per share. (Miller Decl. ¶ 3). At 8:52 a.m., a Red Sea account entered a sell order for 25,500 shares of C02 Tech stock at $0.94 per share. (Miller Decl.

¶ 6). A minute and a half later, in two separate transactions, the Reynolds Group bought the 25,500 shares at $0.95 per share. (Miller Decl. ¶¶ 6–7). At 9:29 a.m., a Red Sea account placed a sell order for 250,000 shares at $0.987 per share, which the Reynolds Group immediately bought for $0.987 per share. (Miller Decl. ¶ 8). At 9:38 a.m., a Red Sea account placed a sell order for 25,000 shares at $1.11 per share. (Miller Dec. ¶ 9). Less than a minute later, the Reynolds Group bought the 25,000 shares at the asked price. (Miller Decl. ¶ 9). On January 30, 2007, the Reynolds Group bought over 1.2 million shares of C02 Tech stock. (Oremland, at A322).

The next day, on January 31, 2007, Bahar arrived at Red Sea's office in Costa Rica and was given a desk on the trading floor. (Bahar, at A220–21, 241, A179). From his home in Boca Raton, Florida, Defendant Weinbaum telephoned Bahar with specific selling instructions, and Bahar relayed those instructions to David Ricci and Ronni Salazar, both traders at Sentry Global. (Bahar, at A233–34; *see also* Weidenbaum, at A379). (Bahar, at A240). Bahar testified that "Ariav told me exactly what amount to put in, which price, which market maker to use." (Bahar, at A243).

These efforts to manipulate the stock of a fictitious company amounted to blatant securities fraud. The existence of Defendants' pump-and-dump scheme is undisputed. Default, consent, and summary judgments have been entered against all Defendants, except for Weinbaum and Zigdon. And the record leaves no question that Defendants Weinbaum and Zigdon violated Section 5 and Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5. The uncontested findings of fact compel the conclusion that the SEC's Motion for Summary Judgment must be granted to the issue of liability. Trial will proceed on the issue of damages.

### III. LEGAL STANDARD

Summary judgment is appropriate where the pleadings and supporting materials establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex*, 477 U.S. at 323–24.

The moving party bears the burden of pointing to the part of the record that shows the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) (holding that the nonmoving party must "come forward with significant, probative evidence demonstrating the existence of a triable issue of fact.").

"Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts." *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). On a motion for summary judgment, the court must view the evidence and resolve all inferences in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, a mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment. *See id.* at 252. If the evidence offered by the nonmoving party is merely colorable or is not significantly probative, summary judgment

11

is proper. *See id.* at 249–50.

## IV. DISCUSSION

As against Defendants Weinbaum and Zigdon, Plaintiff SEC alleges violations of Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5, (Count I); Sections 17(a)(1), (2) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(1), (2) & (3), (Count II); and Sections 5(a) and (c) of the Securities Act, 17 U.S.C. § 77e(a) & (c), (Count IV). As the moving party, Plaintiff SEC bears the burden of demonstrating that there is no genuine issue about any material fact necessary to establish liability for Defendants Weinbaum and Zigdon. Plaintiff SEC has met this burden; the Defendants have failed to identify specific disputed facts. Throughout the discovery period, Defendants Weinbaum, and Zigdon invoked their Fifth Amendment right against self-incrimination in response to questions relevant to the statutory violations. It was not until two months after the close of discovery that Defendants Weinbaum and Zigdon filed responses to Plaintiff SEC's Motion for Summary Judgment and therein attempted to create factual issues. Accordingly, this Court ordered that the declarations of Defendants Weinbaum and Zigdon be struck from the record. (*See* DE #157). Taking all evidence in the light most favorable to the Defendants Weinbaum and Zigdon, the Court finds that Plaintiff SEC is entitled to judgment as a matter of law as to Defendants' liability for Counts I, II, and IV.

### A.     Counts I and II – Anti-Fraud Provisions

Section 10(b) and Rule 10b-5 of the Exchange Act prohibit false statements and market manipulation.[6] Specifically, Rule 10b-5 identifies what constitutes market manipulation and

---

[6] Section 10(b) of the Exchange Act makes it unlawful for any person:

12

makes it unlawful for a person directly or indirectly:

>(a) To employ any device, scheme, or artifice to defraud,
>
>(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
>(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Section 17(a) of the Securities Act imposes similar prohibitions. To establish a violation of Section 17(a)(2) and Rule 10b-5(b), the SEC must prove "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter." *SEC v. Dunlap*, 2002 WL 1007626, at *5 (S.D. Fla. Mar. 27, 2002) (quoting *Ziemba v. Cascade Int'l Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)). To establish a violation of Section 17(a)(1) or (3) and Rule 10b-5(a) or (c), the SEC must prove that an individual "(1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) scienter . . . ." *In re Global Crossing, Ltd. Securities Litig.*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004). The SEC, unlike private litigants, "'does not need to prove investor reliance, loss causation or damages' in actions under 10(b) or 17(a)." *SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1303 (S.D. Fla. 2007) (quoting *SEC v. Credit Bancorp*, 195 F. Supp. 2d 475, 490-91 (S.D.N.Y. 2002). The language of Section 17(a)(1) and (3) and Rule

---

[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe

10b-5(a) and (c) does not require misstatement or omission to have been made directly by the defendants; it is "aimed at broader fraudulent schemes" than Section 17(a)(2) and Rule 10b-5(b). *SEC v. Lee*, 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010).

A pump-and-dump stock scheme is a classic violation of these provisions. The actions of Defendants Weinbaum and Zigdon repeatedly violated the anti-fraud provisions of the Securities Act and Exchange Act. Defendants Weinbaum and Zigdon converted CO2 Tech into a public company by instructing Defendant Krome to find a public shell corporation; opened a brokerage account at Red Sea management to facilitate the stock manipulation; and directed matching buy and sell orders to artificially inflate CO2 Tech's stock value. Individually, Defendant Weinbaum transferred money to Defendant Krome for the shell purchase and hired Defendant Weidenbaum to promote the stock and help organize buy and sell orders. Defendant Zigdon orchestrated the false media campaign surrounding CO2 Tech. That included arranging for the posting of a false website for CO2 Tech that touted "cutting-edge technological developments" and for the issuing of press releases that claimed fictitious achievements such as "CO2 Tech's new solution to reduce polluting gases emitted from airplanes at high altitudes" having "captured" the attention of the Boeing Company.

These undisputed facts leave no doubt that Defendants Weinbaum and Zigdon violated Section 10(b) and Rule 10b-5 of the Exchange Act and Section 17 of the Securities Act. That Defendants Weinbaum and Zigdon manipulated the stock of a nonexistent corporation, with headquarters that were nothing more than a mail drop and a purported manufacturing facility that could not be located, makes their violations all the more clear.

---

as necessary or appropriate in the public interest or for the protection of investors.

### B. Count IV – Section 5 of Securities Act

Section 5 of the Securities Act prohibits any sale, whether direct or indirect, of an unregistered security. Liability for offerors and sellers is strict, "regardless of . . . any degree of fault, negligent or intentional, on the seller's part." *SEC v. Calvo*, 378 F.3d 1211, 1212 (11th Cir. 2004) (quoting *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980)). "Neither negligence nor scienter is an element of a prima facie case under Section 5 of the Securities Act." *SEC v. Friendly Power Co.*, 49 F. Supp. 2d 1363, 1367 (S.D. Fla. 1999). To establish a prima facie case, the SEC must show that: "(1) securities were offered or sold for which no registration statement was filed or in effect; (2) the offering or sale was made through the means or instruments of transportation or communication in interstate commerce or the mails; and (3) defendants, directly or indirectly, offered or sold the securities." *Id.* The defendant need not have directly sold the unregistered security "if it can be shown that he was a 'necessary participant' or a 'substantial factor' in the offering or selling . . . ." *Id.* at 1372 (quoting *SEC v. Holschuh*, 694 F.2d 130, 139 (7th Cir. 1982)).

It is undisputed that CO2 Tech's stock was not registered and that, for the reasons discussed in Part III.A, Defendants Weinbaum and Zigdon were, at the very least, necessary participants and substantial factors in the interstate sale of the unregistered securities. In particular, both Defendants chose to open an account for CO2 Tech with Red Sea Management to facilitate the pump-and-dump scheme; individually, Defendant Weinbaum provided specific buying and selling instructions for the matching orders, resulting in the Reynolds Group alone buying 1.2 million shares in a single day, and Defendant Zigdon orchestrated the false media

---

15 U.S.C. § 78j(b).

campaign to inflate interest in the purchase of CO2 Tech shares. As such, the uncontested facts establish that Defendants Weinbaum and Zigdon violated Section 5 of the Securities Act.

## V. CONCLUSION

Accordingly, after careful review of the record and the Court being otherwise fully advised, it is **ORDERED, ADJUDGED, and DECREED** that summary judgment be, and the same is hereby **ENTERED** in favor of Plaintiff Securities and Exchange Commission and against Defendants Weinbaum and Zigdon as to Defendants' liability under Section 5 and 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5. This Opinion and Order does NOT address the relief to be awarded to the SEC as against Defendants Weinbaum and Zigdon. Such relief will be determined in future proceedings ordered by the Court.

**DONE and ORDERED** in chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida, this 28th day of August, 2012.

*/s/ James Lawrence King*
JAMES LAWRENCE KING
U.S. DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

cc: **Magistrate Judge Chris M. McAliley**

*Counsel for Plaintiff*

**Richard E. Simpson**
Securities & Exchange Commission
100 F Street NE
Mail Stop 4010
Washington, DC 20549-9613
202-551-4492 Fax: 202-772-9246
Email: simpsonr@sec.gov

*Counsel for Defendant Zigdon*

**Michael Spigelman**
20 Lincoln Street, Tel Aviv
Israel 67134
972-3-6254666
Fax: 972-3-6254669

**Richard Eugene Brodsky**
The Brodsky Law Firm, PL
200 South Biscayne Boulevard
Suite 1930
Miami, FL 33131
786-220-3328
Email: rbrodsky@thebrodskylawfirm.com

*Defendant Weinbaum*

**Ariav Weinbaum**
POB 1166
Rishon Lezion 75110
Israel
972527167099