```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                     CASE NO. 11-20561-CIVIL-KING
 3


 4   SECURITIES AND EXCHANGE          Miami, Florida
     COMMISSION,
 5
                     Plaintiff,       August 21, 2012
 6
            vs.                       2:00 p.m. to 3:20 p.m.
 7
     JONATHAN R. CURSHEN, et al.,
 8
                     Defendants.      Pages 1 to 51
 9   _____


10
                     TELEPHONIC EVIDENTIARY HEARING
11            BEFORE THE HONORABLE CHRIS M. McALILEY,
                  UNITED STATES MAGISTRATE JUDGE
12
     APPEARANCES:
13

14   FOR THE PLAINTIFF:       RICHARD E. SIMPSON, ESQ., and
     (Appearing               KEITH O'DONNELL, ESQ.
15    Telephonically)         SECURITIES AND EXCHANGE COMMISSION
                              100 F Street NE
16                            Mail Stop 4010
                              Washington, DC 20549-9613
17

18   REPORTED BY:             LISA EDWARDS, CRR, RMR
                              Official Court Reporter
19                            400 North Miami Avenue
                              Twelfth Floor
20                            Miami, Florida 33128
                              (305) 523-5499
21

22

23

24

25
```

```
 1              THE COURTROOM DEPUTY:  Calling Case No. 11-20561-

 2    Civil-Judge McAliley, Securities and Exchange Commission versus

 3    Curshen, et al.

 4              Counsel, please note your appearances for the record.

 5              THE COURT:  Let's begin with counsel for the SEC,

 6    please.

 7              MR. SIMPSON:  Richard Simpson for the Securities and

 8    Exchange Commission.  And also with me is Keith O'Donnell.

 9              THE COURT:  Okay.  Welcome.

10              Do we have Andrew Badolato on the phone?

11              MR. BADOLATO:  Yes.  I'm here.

12              THE COURT:  Very good.

13              Anyone else on the phone?

14              So the court reporter was just reminding me, it's not

15    so easy for her to do her job with three male voices on the

16    phone.  So while it might make this a little bit slow, each

17    time when you speak, please identify yourself; and just know

18    that I will allow, you know, everyone to speak.  So just give

19    me a chance to get to you.

20              All right.  We're here because I had set an

21    evidentiary hearing.  The evidentiary hearing concerns a motion

22    that Jonathan Curshen filed *pro se* asking that the Court hold

23    Mr. Badolato in contempt for failure to respond to a subpoena

24    for documents that Mr. Curshen had issued to Mr. Badolato.

25              First, let me say that we don't have Mr. Curshen
```

1    present.  It's not for lack of trying on my end.  We had issued

2    a writ over to the Bureau of Prisons to have Mr. Curshen

3    brought here and only found out on Friday that he had been

4    transferred, I think, to New York, to the facility where he's

5    been designated to serve his sentence in the related criminal

6    case.

7              And we had considerable discussions with the Marshals

8    Service about our options; and I decided reluctantly that the

9    best I could do would be to go forward with this hearing today.

10   It's not what I typically would do.  It would take weeks to get

11   Mr. Curshen back here for this hearing.

12             I'm quite familiar with the issues, having dealt with

13   similar subpoenas that Mr. Curshen had issued to other third

14   parties.

15             And I had considerable difficulty, Mr. Badolato,

16   getting a response from you; and I was hoping that you would

17   appear by telephone today, and I'm delighted that you have.  So

18   we're going to talk about the issues relative to the subpoena

19   today, at least as a first step.

20             So Mr. Badolato, what I do want you to do, please, is

21   raise your right hand.  I'm going to ask you to be sworn over

22   the telephone to tell the truth.  Okay?  Is your right hand

23   raised?

24             MR. BADOLATO:  Yes, ma'am.

25             THE COURT:  Go right ahead, then, courtroom deputy.

```
 1            WHEREUPON, ANDREW BADOLATO was duly sworn.

 2            THE COURT:  Mr. Simpson and Mr. O'Donnell, I think

 3    you're mostly in a listening mode here today.  Am I right?

 4            MR. SIMPSON:  This is Mr. Simpson.  That's correct,

 5    your Honor.

 6            THE COURT:  I'll try to remember to turn to you if I

 7    have any questions, and you can let me know if there's

 8    something that you want to address.

 9            So, Mr. Badolato, can you first just give me a little

10    bit of background and tell me what your relationship is to

11    Mr. Curshen, how you know each other and to the best of your

12    understanding how it is that you were served a subpoena by him.

13            MR. BADOLATO:  Sure.

14            I've known him for a considerable time, you know, off

15    and on, I think, since the mid- -- since the late '80s.  For a

16    period of a couple years we worked together.  Then he moved

17    down to Costa Rica.

18            And I originally received the subpoena with only one

19    business day to, you know, reply.  And I was kind of confused

20    because the case number that the subpoena was issued and the

21    interest in, you know, the companies or the details that he

22    mentioned had absolutely nothing to do with the civil case,

23    with the SEC nor the criminal regarding C02, but rather had

24    something to do with a complete separate SEC case and a

25    criminal case in which he pled guilty to that I think he's
```

 1  issued this subpoena to me, you know, with sour grapes because

 2  I did file additional, you know, complaints against him.

 3          I was the CEO of a public company; and he was raising

 4  capital for the company and was -- I guess had used, you know,

 5  the shares that he was provided to -- you know, his firm made

 6  legal payments to individuals.  I was interviewed extensively

 7  and provided documentation and reported -- our company and

 8  myself was a victim of a great crime by himself.

 9          THE COURT:  Let me stop you.

10          MR. BADOLATO:  And this second subpoena that he's

11  issued regarding the CO2 matter, I don't know any of those

12  guys.  I've never spoken to them.  I've then owned any of the

13  stock.  You know, I didn't know anything about it.

14          I followed it, of course, when he was arrested the

15  second time.  But I think that this subpoena that, you know,

16  he's issued -- not only do I not have those documents or are

17  completely irrelevant to this case; and the documents would all

18  be in his possession or seized by authorities in that other

19  case.

20          THE COURT:  So let me stop you and ask you --

21          MR. BADOLATO:  If I --

22          THE COURT:  Mr. Badolato, let me ask you a few

23  questions.

24          MR. BADOLATO:  Okay.

25          THE COURT:  You were the CEO of a public company?  Or

```
 1    you are?
 2           MR. BADOLATO:  The Renewable -- Industrial
 3    Biotechnology Corporation.
 4           THE COURT:  I'm making a note.
 5           MR. BADOLATO:  Yeah.  This was back in -- right before
 6    the economic crisis in September.
 7           Mr. Curshen was, you know, arrested in New York along
 8    with another individual pertaining to the use of our stock that
 9    they committed, you know, federal crimes with; and he was
10    arrested.  I was interviewed, not only provided additional
11    documents, but other -- reported additional crimes to the -- I
12    guess, you know, the FBI representative --
13           THE COURT:  So you --
14           MR. BADOLATO:  -- that I spoke to.
15           THE COURT:  So you were interviewed by the SEC in its
16    civil investigation or by the FBI in its criminal --
17           MR. BADOLATO:  Criminal.
18           THE COURT:  If you would, Mr. Badolato, knowing that
19    there's a court reporter here taking down what we're saying,
20    wait until I finish talking and then answer.  Okay?
21           MR. BADOLATO:  Okay.  I'm sorry.
22           THE COURT:  That's okay.  She's not a miracle worker.
23           So you said that -- what year was this that you --
24    that --
25           MR. BADOLATO:  This was -- I'm sorry.  This is Andrew
```

1  Badolato.  2008.

2       THE COURT:  So in 2008, Mr. Curshen was arrested on

3  the criminal charges; and you say that you understood that some

4  of the alleged fraud that he committed concerned the stock of

5  Industrial Biotech Corporation that you were the CEO of.

6       MR. BADOLATO:  Yes.

7       THE COURT:  And you cooperated with the FBI in its

8  investigation of Mr. Curshen and provided the FBI information

9  regarding the securities fraud.  Is that right?

10       MR. BADOLATO:  Correct.

11       THE COURT:  Okay.  So let me ask you, where do you

12  live now?

13       MR. BADOLATO:  I live in Sarasota.

14       THE COURT:  And is the address 2033 Main Street,

15  No. 404, Sarasota, Florida 34237 the correct address for you?

16       MR. BADOLATO:  Yes.  That is correct for me

17  personally.  The company -- The Renewable Corporation moved

18  over to Palm City, you know, Florida, and so any mail sent to

19  me on behalf of the corporation arrived at the Palm City

20  address or any mail to me personally would come at this

21  address.  But I did move offices here within the same building.

22       It's a large downtown building, and lots of attorneys

23  are in the building.  And I did have, you know, a problem

24  because of the forwarding put in from my former company to --

25  over in Palm City, Florida, and my personal mail.  Things were

```
 1    not -- I wasn't getting my mail regularly.  And I'm unaware of

 2    any contact that you had tried to make with me other than this

 3    last e-mail to me discussing this hearing today.

 4              THE COURT:  Let me --

 5              MR. BADOLATO:  All my mail was subpoenas issued -- the

 6    first one was received by me on February 24th.  The second one

 7    was received by and signed for by the company over in Palm

 8    City.  It was sent to them.  They of course sent it to me.  I

 9    provided them some, you know, background on it, provided them

10    the copy --

11              THE COURT:  Mr. Badolato, it's a little too much for

12    me.  You need to let me ask you some questions.

13              MR. BADOLATO:  Okay.

14              THE COURT:  You're saying a lot, and I can't absorb it

15    all.

16              MR. BADOLATO:  Okay.

17              THE COURT:  So let me walk through this a little bit

18    with you.

19              The address that I read out:  Is that a business or

20    residence?

21              MR. BADOLATO:  A business.

22              THE COURT:  And are you currently employed?

23              MR. BADOLATO:  I'm currently -- well, yes and no.  I'm

24    working on a startup company.  I'm not working for a company

25    that employs me and pays me.  I'm working on a new venture.
```

```
 1              THE COURT:  So you're self-employed.

 2              And the address that I have is for your business

 3      office?

 4              MR. BADOLATO:  Yes, ma'am.

 5              THE COURT:  So you received Mr. Curshen's subpoena --

 6      we know that -- that he issued on February 24th.  Actually, you

 7      were served it on February 24th of this year.  And I have a

 8      letter -- I have a copy of a letter.  It doesn't have a

 9      signature, but it purports to be from you, dated February 24th,

10      to Mr. Curshen.  And do you know what letter I'm talking about?

11              MR. BADOLATO:  Yes.  Yes, ma'am, I do.

12              THE COURT:  And so you wrote that letter, I guess, the

13      day you received your subpoena.  You received it on the date of

14      the letter, February 24th.  And the subpoena called for you to

15      appear just four days later on February 28th for a deposition.

16      And in this letter, you objected to the subpoena and you said

17      that you couldn't on that short notice appear for deposition.

18              Does that sound about right?

19              MR. BADOLATO:  Yes, ma'am.  I called down there

20      first --

21              THE COURT:  Where?

22              MR. BADOLATO:  -- and I noticed that Mr. Curshen had

23      prepared it individually.  And so I -- this letter -- I did

24      send registered mail to him.  So I do have or can find in my

25      e-mail -- I'm pretty sure I scanned it -- my signed letter, you
```

1    know.

2            THE COURT:  I see.  So this was on your computer.  You

3    signed it, mailed it to him and then kept the copy of the

4    letter on the computer, obviously, unsigned.  And that's what

5    got printed out and filed by, I think, someone on behalf of

6    Industrial Biotech Company.

7            MR. BADOLATO:  Yeah.  It's Industrial Biotechnology,

8    which has changed their name to The Renewable Corporation.  And

9    they received the second subpoena saying that -- the contempt

10   for Mr. Curshen.

11           THE COURT:  And we'll come back to generally what you

12   address in that letter.  But that was February 24th that you

13   signed that letter.

14           And then, so that you know, it was on May 1st of this

15   year that Mr. Curshen filed his motion for contempt, saying

16   that he had never gotten anything from you.

17           And I issued an order to show cause on May 11th

18   directed to you and also to The Renewable Corporation, and I

19   ordered that you and The Renewable Corporation file a written

20   response to my order by May 25th to show cause why you should

21   not be held in contempt to failure to respond to the subpoena.

22           And I directed that -- whatever response you filed

23   with the Court you should serve on Mr. Curshen.

24           We mailed that to the address that I read to you, 2033

25   Main Street, Suite 404, Sarasota, Florida.  Did you receive

1    this order?

2         MR. BADOLATO:  I don't recall.  Otherwise, I would

3    have replied.  I would have said that I felt that I did comply

4    by sending Mr. Curshen this letter on February the 24th.

5         So his very action in stating that he didn't receive

6    anything to me is incorrect.  I could probably -- I couldn't

7    locate it -- find the registered mail receipt where I sent it

8    to him on February the 24th.  I'm not sure if the FDC keeps

9    records or not, you know, of the receipt of that.  But I did

10   send that to him registered mail on February 24th after I

11   called down there.

12        THE COURT:  But I'm asking you about my court order

13   right now, whether you received it.

14        MR. BADOLATO:  Yeah.  I don't recall -- I recall being

15   notified by The Renewable Corp over in Palm City that sent you

16   the second -- let's see if I've got a copy of it.

17        THE COURT:  My order to show cause was also directed

18   to The Renewable Corp.  And they got it.

19        MR. BADOLATO:  Yeah.

20        THE COURT:  It responded.

21        Did someone from that company give you a copy of my

22   court order?

23        MR. BADOLATO:  Yes.  They notified me that they

24   received it because my name is on it and of course it -- they

25   knew nothing about the background of it.  So I was made aware

1    of it from them and their receipt of it, even though it was

2    sent to me regular mail here.  I was made aware of it by them

3    when they received it.

4         THE COURT:  Well, what I'm wondering is, even if you

5    got it late, why didn't you respond to it?  I didn't get any

6    response from you, which started -- which obviously was a

7    concern to me.  I don't issue a court order like that every

8    day.

9         MR. BADOLATO:  Yeah.  And I'm very sorry.  I had

10   given -- you received a response from them.  And what I did

11   was -- is I sat over there and I pulled my e-mail here that I

12   sent to them.

13        And here's where I think the problem or my -- my error

14   in understanding this in order to respond, is I have a letter

15   here that I sent to Mr. Gary Alexander, who responded to you on

16   behalf of the company that states, Please send the following:

17   you know, via fax and registered mail.

18        I figured that he would reply on behalf of the

19   parties, which my involvement in this would be as my capacity

20   as the CEO -- former CEO of the company and all of the deals

21   with Mr. Curshen.

22        THE COURT:  So you thought that it would be adequate

23   for The Renewable Corporation to respond collectively on its

24   own behalf and on your behalf?

25        MR. BADOLATO:  Yes.  And here's a copy of the letter.

1  "Dear Honorable Judge Chris [sic]:  I fully complied with the

2  original subpoena request and sent the following attached

3  letter to Jonathan Curshen on the same day as receiving the

4  subpoena."

5          No. 1 -- and I had -- so it was apparent to me at that

6  time that Mr. Curshen in filing the demand for production

7  had -- didn't say that he received the letter from me.  So I

8  wrote -- and I'll continue on.

9          THE COURT:  Hold on one second.

10          MR. BADOLATO:  I have a couple points.

11          THE COURT:  Hold on.  The letter you're reading me is

12  from you to The Renewable Corp?

13          MR. BADOLATO:  Yeah.  To -- dated June the 7th.  It's

14  an e-mail to Gary Alexander.

15          THE COURT:  June 7th.  You're e-mailing Gary Alexander

16  because Gary Alexander's offices told you about my order to

17  show cause?

18          MR. BADOLATO:  Yes.

19          THE COURT:  You're asking him to respond on your

20  behalf to my order to show cause.  Is that the basis --

21          MR. BADOLATO:  Right.  Because he's the one that

22  received it, meaning he's the books and records of the former

23  company that I was CEO of.  So of course there's an integration

24  with lots of issues:

25          "What is this?"

```
 1              "Hey, we got this in, Andy.  What does this have to do
 2     with?"
 3              So he received the demands for -- or the letter from
 4     you.  I do not recall ever receiving it here.  Maybe I didn't
 5     open it.  I have lots of stuff of -- stock mail and things like
 6     that.
 7              I recall me being aware of it was from him.  He said,
 8     "Hey, we just got this in."
 9              I go, "You know, that's crazy, because I complied with
10     this."  I sent the letter directly to Mr. Curshen registered
11     mail on February the 24th.
12              So I felt that collectively he would reply on behalf
13     of the company/myself.
14              And here is my draft letter addressed to you, which,
15     you know, I was actually unaware of until today that you did
16     not receive this letter that states that we were only provided
17     one day.  The items requested of the very few known individuals
18     that are entities pertain only to a completely separate civil
19     and criminal case filed against Mr. Curshen that has been
20     closed by the criminal court, Mr. Curshen's guilty plea and
21     subsequent sentencing.  And the parallel circumstantial charges
22     in a completely separate SEC civil case that appeared to me --
23     and I went on PACER -- to be no longer active.
24              The records of those known individuals and entities
25     pertaining to the previous criminal and civil cases have
```

1    already been previously provided to federal authorities by the

2    company in 2008.

3           All the other records were seized by federal

4    authorities in a raid of Mr. Curshen's principal Costa Rica

5    office in the fall of 2008.

6           In addition, after -- there was extensive public

7    disclosure made in the company's, you know, filings that are of

8    public record pursuant to his arrest and, you know, the

9    company's involvement with Mr. Curshen in that matter.

10          The documents Mr. Curshen requested have zero -- have

11   absolutely no relevance, affiliation or association in any way

12   to Case No. 20561 and the people under these circumstances or

13   charges against it.

14          Thus, the subpoena was either issued by mistake by

15   Mr. Curshen, using the wrong case number, and/or an attempt by

16   Mr. Curshen to circumvent or obtain documents for criminal and

17   civil cases already resolved or retribution and ill will

18   towards, you know, myself and the company for, you know, his

19   perception of, you know, we ratted on him or, you know, I sent

20   additional complaints against him.

21          And, you know, that's really what I -- you know, I

22   think that it is.  And Mr. Curshen is blatantly lying, A, that

23   he never received something from me on -- that I sent on

24   February the 24th; and the recent allegations that I read here

25   about this -- you know, that I personally made money on the

```
 1    CO2 -- that's a complete, utter falsehood, like not even close.

 2    I didn't even hear about the company until I saw him arrested.

 3              And a review of the criminal case and the civil case

 4    and all those individuals -- I've never heard their name, never

 5    spoke to them, never e-mailed, you know, know nothing about it.

 6              So it's -- you know, I apologize for my

 7    misunderstanding of that, your Honor.

 8              And how I replied -- I had provided it to him to --

 9              THE COURT:  Stop.

10              Let me ask you a question or two.

11              MR. BADOLATO:  Okay.

12              THE COURT:  I also want to ask you, did you ever

13    receive a copy of Mr. Curshen's motion filed on May 21st asking

14    that the Court hold you in contempt for not complying with the

15    subpoena?  Did you ever receive that?

16              MR. BADOLATO:  Yes.  I do recall receiving that.

17              THE COURT:  So you got Mr. Curshen's motion back on

18    May -- it was dated -- filed with the Court on May 1st, so it

19    would have been about then.

20              MR. BADOLATO:  Yeah.  I'm sorry.  I don't -- I know

21    I've seen it.

22              THE COURT:  Have you seen it because you went on PACER

23    or did you receive a copy of it from Mr. Curshen at the time?

24              MR. BADOLATO:  I'm sorry.  I cannot pick which one.  I

25    know I've seen it on PACER.  And if I -- I don't -- I don't,
```

1    you know, recall.

2              THE COURT:  All right.

3              MR. BADOLATO:  My company when it moved here had a

4    history of raising capital, and it downsized.  And I got to

5    tell you, I'm the only one that comes in here to this new

6    office.  And I get two or three feet of mail and sometimes work

7    out of my home or travel and don't come in here but every two

8    weeks.

9              And I don't like going through the mail because it's

10   nothing but bills.  I'm sorry.  It's big stacks of it.

11             THE COURT:  So let me go back, then, to the subpoena

12   itself.

13             Part of why I'm talking to you today is the letter

14   that you wrote on February 24th didn't conclusively say that

15   you had thoroughly searched and you had no responsive

16   documents.  It kind of left the door open that you might,

17   because you were saying you had just gotten it and it would

18   take a considerable amount of time for you to search.

19             So in the order setting this hearing, I specifically

20   directed that you go back and conduct a thorough search so that

21   you'd able to tell me under oath today whether you do have any

22   documents concerning the allegation that you received money

23   from the sale of CO2 to Tech Securities or documents responsive

24   to particular sections of the subpoena.

25             Are you familiar with that order?  Do you know what

```
 1    I'm talking about?

 2            MR. BADOLATO:  Yes.

 3            THE COURT:  So putting aside your saying that this is

 4    not relevant -- that's really for me to figure out --

 5            MR. BADOLATO:  Yes.

 6            THE COURT:  -- have you taken the time to go back

 7    through any records, either in your actual possession or that

 8    you could get access to, to search for the particular documents

 9    referenced in Paragraph 4 of the order that I issued scheduling

10    this hearing?

11            MR. BADOLATO:  Yes.

12            THE COURT:  Okay.  Tell me where you searched, how you

13    looked.

14            MR. BADOLATO:  I did a scan of my computer, you know,

15    drive.

16            THE COURT:  When you say a scan, what do you mean?

17            MR. BADOLATO:  A search, a key word search, on my

18    saved e-mails or documents and all of the companies that he had

19    mentioned in there of whose records would actually be in his

20    firm's possession that were seized.

21            The only item that I have is a schedule that was given

22    to my tax preparer for securities that were sold at his firm in

23    the year 2004, 2005, 2006, but were not CO2.  So I have no

24    records at all of CO2 matters nor any records of the

25    individuals named in the case.
```

 1          His list of the -- the list provided, you know, of all

 2   of those different names are not my individual property.  It

 3   would be those of the company.  And they don't have them, nor

 4   do I.  I provided records to the, you know, FBI in 2008.

 5          THE COURT:  Well, as a point of that, again, you gave

 6   your original records to the FBI and you didn't maintain a

 7   copy?

 8          MR. BADOLATO:  It was from 2008.  And I looked at my

 9   three or four major boxes in an area where I had kept this, and

10   I could not find anything.

11          I could indicate that I can spend time and would

12   provide any documents that I do find pursuant to that if --

13   within a reasonable amount of time that you could provide me.

14          THE COURT:  The point of our talking today,

15   Mr. Badolato, is I wanted you to do the search so we could

16   conclusively know whether you have documents responsive to

17   those sections of the subpoena.  So I was -- we were going

18   through what search you did.

19          First, you looked on your computer.  Is that a

20   personal computer or a business computer?

21          MR. BADOLATO:  Business computer.

22          THE COURT:  And is that the only computer that would

23   contain any documents, electronic, you know, documents that

24   might be responsive to the subpoena?  Are there other computers

25   that you'd have to search?

```
 1            MR. BADOLATO:  It's where I keep everything that's --

 2     it's where I keep all of my files and e-mails.

 3            THE COURT:  So it's one computer?

 4            MR. BADOLATO:  Yeah.

 5            THE COURT:  Is that at your home?

 6            MR. BADOLATO:  It's at my office.

 7            THE COURT:  At your office.  Okay.

 8            And you did a key word search.  And did you use

 9     different key words to try to capture the various subjects that

10     were addressed by the subpoena?

11            MR. BADOLATO:  Yes.

12            THE COURT:  Then --

13            MR. BADOLATO:  The one item that I -- I'm sorry.

14            THE COURT:  Go ahead.

15            MR. BADOLATO:  The one or two items I do have is the

16     schedules provided for my, you know, tax preparer and other

17     publicly available documents that the company filed.

18            THE COURT:  I'm going to come --

19            MR. BADOLATO:  So The Renewable Corporation has

20     filings that are publicly, you know, available.

21            But what I would like to reiterate is that I could

22     completely understand and it would make sense if Mr. Curshen

23     issued the subpoena for documents pertaining to Industrial

24     Biotechnology Corp. for a completely separate SEC case and the

25     criminal case --
```

```
 1              THE COURT:  Let me --
 2          MR. BADOLATO:  -- the company was involved with.
 3          But as far as it pertains to this case, there's, like,
 4   zero relevance.  It would be like just -- there's zero -- zero
 5   relevance.
 6              THE COURT:  Mr. Badolato, let me kind of do this my
 7   way.  I'm going to come back to the relevance issue.  Right now
 8   I'm trying to understand how you conducted your search.
 9          MR. BADOLATO:  Okay.
10              THE COURT:  And so you searched the computer.  You did
11   key word searches.  Did you also look through files?  Do you
12   have files created on your computer that you organize, you
13   know, for documents?  Is there a file search that you did?
14          MR. BADOLATO:  Yes.
15              THE COURT:  And have you set up files for different
16   subject matters for your work?
17          MR. BADOLATO:  Yes.
18              THE COURT:  And did you search through those files?
19          MR. BADOLATO:  Yes.  But I can also indicate I'm a
20   single, you know, father, and I've gone through an enormously
21   difficult financial time.  There's no staff here whatsoever.
22   For me to exhaust everything that's in this room would probably
23   take me almost a couple weeks.
24              THE COURT:  When you say -- right now we're just
25   talking about the computer.
```

 1            MR. BADOLATO:  Yes.

 2            THE COURT:  You said everything in this room.  Are you

 3    talking about something other than the computer?

 4            MR. BADOLATO:  There's some file cabinets, yes.

 5            THE COURT:  So just sticking with the computer, did

 6    you look through the files in your computer for responsive

 7    documents?

 8            MR. BADOLATO:  Yes.

 9            THE COURT:  Did you feel you had an opportunity to

10    make a pretty thorough search?

11            MR. BADOLATO:  Yes.

12            THE COURT:  Is there any other place -- any other way

13    you would have searched your computer other than a key word

14    search or a search of files?

15            MR. BADOLATO:  No.

16            THE COURT:  Do you also have e-mails set up in files?

17    Are there folders for e-mails?

18            MR. BADOLATO:  Yes.

19            THE COURT:  Did you look for any pertinent folders to

20    see if you had e-mails that were responsive to the sections of

21    the subpoena I listed in my order?

22            MR. BADOLATO:  Yes.  The search on my hard drive and

23    key words would include the e-mails.

24            THE COURT:  And so in that search of your computer,

25    did you find any documents responsive to those sections of the

```
 1    subpoena that I set out in my order?

 2            MR. BADOLATO:  Yes.

 3            THE COURT:  You found some responsive documents?

 4            MR. BADOLATO:  Yes.  The tax....

 5            THE COURT:  Schedule?

 6            MR. BADOLATO:  Yes.

 7            THE COURT:  So there's a schedule prepared for your

 8    tax preparer of securities sold at Curshen's firm.  Is that

 9    right?

10            MR. BADOLATO:  That's correct.

11            THE COURT:  For the years 2004 to 2006?

12            MR. BADOLATO:  Yes.

13            THE COURT:  And --

14            MR. BADOLATO:  2003 to 2006, yes.

15            THE COURT:  Does it go into the year 2006 or stop at

16    the beginning of 2006?

17            MR. BADOLATO:  It goes into the year 2006.

18            THE COURT:  Because the subpoena asks for documents

19    beginning on January 1st of 2006.  So anything earlier is not

20    within the scope of the subpoena.

21            MR. BADOLATO:  Okay.

22            THE COURT:  I'm just double-checking.

23            Mr. Simpson, I trust that you have that subpoena in

24    front of you, or Mr. O'Donnell, and you're following this?  Am

25    I right?
```

```
 1              MR. SIMPSON:  Yes, your Honor.

 2              THE COURT:  Because I want you to tell me if there's

 3    anything you hear me saying incorrectly, if I'm

 4    misunderstanding something, or if you have some information

 5    contrary to what Mr. Badolato is saying.

 6              So let me stop right now and ask you:  Up to this

 7    point, is there anything you can add to this conversation to

 8    correct anything that he or I have said?

 9              MR. SIMPSON:  No, your Honor.

10              THE COURT:  Well, I'm going to count on you to speak

11    up if you do.

12              MR. SIMPSON:  We'll let you know, your Honor.

13              THE COURT:  So these schedules of securities sold:  Is

14    it one schedule per year or are they multiple schedules?

15              MR. BADOLATO:  Everything's on one single spreadsheet.

16              THE COURT:  For all those years?

17              MR. BADOLATO:  Yes.

18              THE COURT:  So it's one document?  It's one

19    spreadsheet?

20              MR. BADOLATO:  Yes.

21              THE COURT:  For the years 2003 to 2006?

22              MR. BADOLATO:  Yes.

23              THE COURT:  And so that would include, then -- would

24    that include -- can you tell me, are you able to tell me what

25    part of the subpoena that's responsive to?  Do you have that
```

```
 1    subpoena in front of you?

 2              MR. BADOLATO:  I wasn't able to point out this one

 3    thing here.  And I'm not disrespecting the Court or you or your

 4    Honor.  But I'm not -- I take it seriously.  Of course, any

 5    matters involving the SEC or the federal courts.

 6              But these things that he requested, once again,

 7    have -- I could understand if he requested them and subpoenaed

 8    them under a completely separate SEC civil case that pertains

 9    to Industrial Biotechnology and the SEC -- there's another case

10    against him related to a criminal case from 2008.  I could

11    completely understand if --

12              THE COURT:  I know you actually want to talk about

13    relevance.

14              MR. BADOLATO:  But I --

15              THE COURT:  Mr. Badolato --

16              MR. BADOLATO:  He's trying to get retribution or

17    something.  And I'm not saying I didn't take it seriously.  I

18    can look.  It's going to take me a couple weeks and hiring a

19    staff to -- to see this, that at the end, none of it has

20    anything to do with CO2 Corp.

21              THE COURT:  Stop.

22              Tell me clearly, because I don't understand yet, and I

23    was hoping not to have to go there if I didn't have to:  Why is

24    it that you are so clear that the subpoenaed documents are

25    completely irrelevant to the civil lawsuit that is currently
```

```
 1   before the Court?

 2           MR. BADOLATO:  In my review of the CO2 criminal

 3   complaint --

 4           THE COURT:  No, not the criminal complaint.  Put that

 5   aside.

 6           MR. BADOLATO:  -- and the SEC complaint --

 7           THE COURT:  No.  Hold on.  Let me be clear.

 8           MR. BADOLATO:  Okay.

 9           THE COURT:  Put aside the criminal complaint.  This

10   case is not about the criminal case.  It is a civil case.

11           MR. BADOLATO:  Okay.

12           THE COURT:  So do you know what the civil case is

13   about?

14           MR. BADOLATO:  Yes.

15           THE COURT:  What do you think it's about?

16           MR. BADOLATO:  It's involving different individuals

17   named, which were the same individuals named in the criminal

18   justice complaint --

19           THE COURT:  Do you mean Curshen and others?

20           MR. BADOLATO:  Yes.

21           THE COURT:  Okay.

22           MR. BADOLATO:  And circumstances in violation of

23   securities laws that are identical or similar -- extremely

24   similar in nature to the criminal complaint involving the

25   shares of C02 and, you know, other matters.
```

```
 1              THE COURT:  Let me turn to Mr. O'Donnell or
 2    Mr. Simpson.
 3              Something I have struggled with throughout this is
 4    understanding Mr. Curshen's subpoena.  And I asked for him and
 5    the SEC to help me clarify what the relevance is.  Honestly, I
 6    didn't find it particularly helpful from anybody.  But maybe
 7    you can help me out here.
 8              The subpoena is extremely difficult to understand the
 9    way it's written.  Could you in a nutshell very, very simply
10    tell me what the claim is against Mr. Curshen in the civil
11    case?  I didn't go back and reread it this morning.  I've
12    looked at it in the past.  But I'm not going to rely upon my
13    memory.
14              MR. SIMPSON:  Okay.  Well, first of all, two things.
15              I think I remember Mr. Curshen stating that he
16    basically took an SEC investigative (unintelligible) --
17              THE COURT:  Hold on.  You're breaking up.
18              MR. SIMPSON:  Okay.
19              THE COURT:  Would you start over?  Who is this
20    speaking, by the way?
21              MR. SIMPSON:  This is Mr. Simpson.
22              I recall Mr. Curshen stating that the way that he
23    constructed these subpoenas to Mr. Badolato and The Renewable
24    Corporation was that he just copied an SEC investigative
25    subpoena.
```

```
 1              THE COURT:  Yes.
 2              MR. SIMPSON:  And that's how he came up with this long
 3    list of names that appear on the subpoena.
 4              So I think that's sort of an explanation of kind of
 5    how the subpoena was put together.
 6              THE COURT:  Is that a fair statement?  Did the SEC
 7    write a subpoena like this?
 8              MR. SIMPSON:  Well, we included, I think, a list of
 9    names.  And there are names of a lot of people who are involved
10    in the SEC case, including, you know, employees of
11    Mr. Curshen's company and so on and so forth.
12              THE COURT:  But the Curshen subpoena:  Do you have it
13    in front of you?
14              MR. BADOLATO:  Yes.
15              THE COURT:  It first has a paragraph for any account
16    held with -- it's hard for me to read -- Sentry Global
17    Securities, Sentry Global Trust, Red Sea Management, US or
18    LPS&C International Legal Services or any other entity.  Then
19    the sentence drops off and there's a list of names.
20              MR. SIMPSON:  Right.
21              THE COURT:  Is that list of names names that were
22    copied from an SEC administrative subpoena?  Is that what you
23    understand to have been copied from a subpoena?
24              MR. SIMPSON:  Maybe not verbatim, but I think he got a
25    lot of names from one of our investigative subpoenas.
```

 1              THE COURT:  And then after that list of names, the

 2    sentence picks up:  "...or that is or was held jointly or

 3    individually in the name of the parties identified above or

 4    which you have had any beneficial interest or exercised

 5    control, including trading authority or wire transfer,

 6    check-writing authority or had or have any relationship to any

 7    kind, must produce the following documents."

 8              I have a fundamental problem right there.  It's not in

 9    English that I can understand, to be perfectly honest.  But

10    then there's a series of things that I do understand the

11    sentences.  I don't know how to relate them to what came

12    before.

13              And so, Mr. Simpson, can you --

14              MR. SIMPSON:  I think Mr. O'Donnell may have some

15    light to shed on this, so I'll let him talk.

16              MR. O'DONNELL:  Yes, your Honor.  I was involved in

17    the investigation from, sort of, day one.

18              I think what we have is a large universe of things

19    that we were looking at that were, I guess, sort of focused on

20    Mr. Curshen's operation in the Red Sea firm that he had

21    offshore in Costa Rica.

22              THE COURT:  Mr. O'Donnell, are you talking about an

23    SEC administrative investigation that you're involved in?

24              MR. O'DONNELL:  I guess it's the preliminary

25    investigation before we filed the case.

1          THE COURT:  This case?

2          MR. O'DONNELL:  Yes.  But it was looking at a broad

3   array of things that touched on Mr. Curshen's business.  And so

4   some of these names and these individuals, you know,

5   Mr. Badolato may be correct, may not have anything to do with

6   $CO_2$ Tech, but they had to do with the operation that

7   Mr. Curshen was, we believe, in charge of down in Costa Rica,

8   which is, I think, fairly characterized -- and we probably said

9   this in the complaint -- as a pump and dump shop.

10          THE COURT:  What was the name of that operation?

11          MR. O'DONNELL:  Well, Red Sea Corporation is sort of

12   the umbrella organization.  But Sentry Global Securities was

13   the securities firm arm of it that ran through a lot of these

14   deals that some of these names were like a client list of the

15   firm, and so they've been going for a number of years, which

16   covers some of the periods that have been mentioned here today.

17   But it went forward and eventually, you know, $CO_2$ Tech was one

18   of many of those in the universe.

19          THE COURT:  $CO_2$ Tech was owned by -- not by Curshen.

20   Right?

21          MR. O'DONNELL:  Well, I guess there are nominal owners

22   and then there are the real party beneficiaries.  And in the

23   case of the real party beneficiaries, there were two Israelis

24   who were in turn clients of Red Sea and Sentry Global in the

25   sense of having their deal run through that operation.

```
 1              THE COURT:  So am I right that in the current pending

 2   civil enforcement action that's before Judge King, and me in a

 3   small way, that the claim is that Mr. Curshen operated or

 4   facilitated CO2 Tech's engaging in securities frauds?  Is that

 5   right?

 6              MR. O'DONNELL:  Yes, ma'am.

 7              THE COURT:  But that in your investigation that you

 8   conducted before you filed the current civil lawsuit, you threw

 9   out a much bigger net, so to speak --

10              MR. O'DONNELL:  Yes.

11              THE COURT:  -- and inquired of many entities and

12   individuals, many of whose names we see on the subpoena.  Is

13   that right?

14              MR. O'DONNELL:  Correct.  Correct.

15              THE COURT:  Can you in a nutshell tell me what the

16   allegation is against Mr. Curshen in this lawsuit?

17              MR. O'DONNELL:  In the current lawsuit?

18              THE COURT:  Yes.

19              MR. O'DONNELL:  That the CO2 Tech shares were put into

20   an account that was held by Mr. Curshen's firm or at least was

21   directed and controlled by the trading arm of Red Sea, the

22   Sentry Global Securities.

23              And they were engaged in massive sellings of CO2 Tech

24   that was facilitated by a promotional program on the one hand,

25   where people were making a bunch of claims that we allege were
```

1   false and misleading in a coordinated buying program where

2   people in league with Mr. Curshen were supplying buy-site

3   support for the stock, with the assurance that they would be

4   reimbursed by Mr. Curshen and/or the beneficiary owners, the

5   two Israelis, and that together those activities created an

6   artificial market for $CO_2$ Tech in which those shares were

7   dumped on behalf of the people who were perpetrating this.

8            MR. SIMPSON:  Your Honor, this is Mr. Simpson again.

9            Just in a nutshell, basically, the allegations against

10  Mr. Curshen is that he participated in a market manipulation of

11  $CO_2$ Tech stock.

12           THE COURT:  And obviously the allegation is that he

13  profited from it.

14           Judge King has already found for the SEC on liability.

15  The question now is one of damages.  Right?

16           MR. SIMPSON:  Correct.

17           MR. O'DONNELL:  Yes.

18           THE COURT:  And I recall Mr. Curshen, I believe -- his

19  primary concern, the damages that he articulated, was the

20  concern that to the extent that others -- and I'm going to look

21  in a minute for the document that he filed -- and you can state

22  it, I bet, more articulately than I can -- but that others may

23  have -- such as possibly Mr. Badolato and his firm had profited

24  from the $CO_2$ Tech stock; and that to the extent that's so, it

25  might diminish the damages Mr. Curshen could be held

 1    accountable for.

 2            Mr. Simpson or Mr. O'Donnell, am I stating that fairly

 3    accurately?

 4            MR. O'DONNELL:  Yes, your Honor.  It's Keith

 5    O'Donnell.

 6            I believe that's Mr. Curshen's assertions; but I guess

 7    we could respond, if you want to go into the merits of that.  I

 8    don't know if that would be helpful.

 9            THE COURT:  First I want to review his assertion.  I'm

10    trying to go out of my way to do so thoroughly, knowing that

11    he's not here, to see how much of a grip I can get on this.  If

12    I have to bring him back down -- which is no convenience to him

13    to have to go through that, being transported -- but if I need

14    to, I'm going to consider it.  But I thought today I would get

15    as far as I thought I reasonably could.

16            MR. O'DONNELL:  Yes.

17            THE COURT:  So in terms of his allegation, I'm going

18    back over to Docket Entry 167, which is his response he

19    provided to the Court.

20            Give me one second just to read this section of it.

21            So there's a paragraph on Page 2.  I'm just going to

22    read it.

23            I don't know, Mr. Badolato, if you have seen this.

24    It's a document that Mr. Curshen filed explaining why he

25    thinks --

1          MR. BADOLATO:  No.

2          THE COURT:  You have not.

3          MR. BADOLATO:  No.  I have not seen it.

4          THE COURT:  So listen to this.  I'm going to -- just

5    hold your horses for a minute, because I'm going to turn back

6    to the Government counsel for a minute.  All right?

7          MR. BADOLATO:  Okay.

8          THE COURT:  This is what Mr. Curshen wrote:

9    "According to evidence and testimony presented at trial in Case

10   No. 11-" -- well, the criminal case.  What judge were you in

11   front of?

12         MR. SIMPSON:  That was Judge Goldberg, I believe.

13         THE COURT:  Judge Goldberg.  Right.  That's right.  So

14   it was the criminal case in front of Judge Goldberg.

15         -- "all of the proceeds of the sale of CO2 Tech

16   securities were passed through the account at SGS titled Eon,"

17   E-O-N, "Trust.

18         "During this same time period that CO2 Tech sale

19   proceeds passed through the Eon account, the Eon account

20   purchased more than 400,000 worth of capital IBOT securities.

21   The majority of the $400,000 of IBOT securities that was

22   purchased by Eon was credited to the accounts beneficially

23   owned and controlled by Badolato, SGS.  In short, Badolato

24   received almost $400,000 from the sale of CO2 Tech securities.

25   Badolato wired monies from IBOT securities sale proceeds to an

```
1   attorney trust account located in the United States.  Badolato

2   personally advised Curshen that IBOT and himself received

3   benefit of the IBOT sale proceeds.

4        "Badolato personally receiving benefit from the IBOT

5   securities issued under Rule 504 is not legal, as Badolato did

6   not disclose his ownership of the two Texas corporations that

7   subscribed to the offering."

8        Skipping down to the top of Page 3:  "No one but

9   Badolato and Barquin received any benefit from the sale of IBOT

10  securities sold from the accounts at SGS, and Badolato's and

11  Barquin's SGS account statements will prove that factual."

12       Give me a minute.  I'll keep reading.

13       "The corporate documents requested from Badolato in

14  the subpoena will show Badolato was the sole beneficial owner

15  of corporate entities that purchased securities from IBOT,

16  deposited those securities in his accounts at SGS, sold the

17  majority of those securities to the Eon account at SGS during

18  the time period of the alleged CO2 Tech securities sales and

19  then wired those funds to accounts that Badolato and RWNC were

20  the sole beneficiaries of, Renewable Corporation."

21       So let me turn to Government counsel.  I realize

22  you're an advocate to the Government.  But right now I need you

23  just to be an officer of the Court and help me out here.

24       MR. O'DONNELL:  Yes, ma'am.

25       THE COURT:  Can you help me out in understanding from
```

```
 1    Mr. Curshen's point of view what he's saying there, as wrong as
 2    you might think he is?
 3              MR. O'DONNELL:  Yes, your Honor.  Keith O'Donnell.
 4              This Eon trust account from what we understand was an
 5    internal account at Red Sea that was primarily used by
 6    Mr. Curshen to do, you know, things that were sort of credited
 7    to him in his name.
 8              But in the case of the CO2 Tech transaction, he also
 9    used it to facilitate the distribution of the proceeds of that
10    particular transaction, and he may have used it also in the
11    case of IBOT.  So there could have been funds that were
12    commingled in there.
13              But I guess the other sort of Red Sea internal
14    documents purported to keep track separately of the CO2 Tech
15    proceeds -- and a lot of that is in the form of wire requests
16    to their outside bank at HSBC -- they purport to account for
17    almost all of the CO2 Tech proceeds being benefited not to
18    Mr. Badolato, not to IBOT, but to the Israelis who were in
19    control of CO2 Tech.
20              THE COURT:  So bring us back to how this could be
21    relevant arguably to your claim for damages.
22              MR. O'DONNELL:  From Curshen's perspective or from
23    ours?
24              THE COURT:  From Curshen's perspective.
25              MR. O'DONNELL:  I think Mr. Curshen is going to allege
```

1   that Mr. Badolato and his company may have shared in the

2   proceeds of the CO2 Tech transaction, and therefore he is --

3   wants to get credit to the extent that diminishes his monetary

4   damages.

5          And understanding, your Honor, that we don't agree

6   with Mr. Curshen's, you know, description of how this --

7          MR. SIMPSON:  Your Honor --

8          THE COURT:  And this is?

9          MR. SIMPSON:  Mr. Simpson again.

10         Basically, I think that Mr. Curshen is saying that the

11  CO2 Tech proceeds went into the Eon trust account; and then at

12  the same time while the money would have been there, $400,000

13  was transferred out of Eon to the benefit of Mr. Badolato and

14  his companies, and therefore Mr. Badolato received $400,000 of

15  CO2 Tech sales proceeds.

16         THE COURT:  Thank you.  That sounds about what I

17  thought I was reading for Mr. Curshen's statement.

18         MR. BADOLATO:  Your Honor?

19         THE COURT:  Is this Mr. Badolato?

20         MR. BADOLATO:  Yes.

21         THE COURT:  I'm going to get to you --

22         MR. BADOLATO:  I know.  I was unaware -- this is

23  Mr. Badolato.

24         THE COURT:  Could you wait one minute?

25         MR. BADOLATO:  Okay.  Yes, ma'am.

```
 1              THE COURT:  I promise -- trust me, I'm coming back to

 2    you.

 3              MR. BADOLATO:  All right.

 4              THE COURT:  In the damages claim now, tell me, putting

 5    aside what we just talked about, what is your claim for damages

 6    against Mr. Curshen?  What's at issue?

 7              MR. SIMPSON:  At issue is the total $7 million stock

 8    sale proceeds in CO2 Tech.

 9              And we're alleging that Mr. Curshen is jointly and

10    severally liable with the two Israeli Defendants.  And we're

11    basically leaving it up to the Defendants to prove how -- if

12    and how the money was segregated and divided between them.

13              THE COURT:  Did you say a total of $7 million?

14              MR. SIMPSON:  That's correct.

15              THE COURT:  So you've documented -- you feel you can

16    document $7 million worth of proceeds of the sale, the

17    fraudulent, unlawful sale of CO2 stock, and you're saying that

18    collectively Mr. Curshen and the two Israeli Defendants are

19    responsible for essentially repaying that, right, as a penalty?

20    As damages?

21              MR. SIMPSON:  Yes.

22              THE COURT:  So if some -- if, arguably, Mr. Curshen

23    could show that a portion of the proceeds in fact went to

24    someone else, John Doe, some other third party, would that

25    serve to -- and that didn't get in his pocket, but got in John
```

1    Doe's pocket, wouldn't that serve to reduce the damages that he

2    might be ordered to pay?

3          MR. SIMPSON:  Hypothetically, yes.

4          THE COURT:  I understand.

5          So isn't what he's saying here -- and I have no

6    opinion about the accuracy of this, none whatsoever, but I'm

7    trying to understand it.  Isn't what he's saying here that he

8    thinks that $400,000 of the proceeds of the sale of CO2 stock

9    went ultimately into Mr. Badolato's pocket or the pocket of his

10   company, and so he's looking for documents to show that so that

11   he can reduce by that amount the damages that he may have to

12   pay?

13         Government counsel?

14         MR. SIMPSON:  I believe that would be relevant.

15         THE COURT:  Right.  If he could show that, he would --

16   he could certainly argue that it's relevant to the calculation

17   of final damages.  Is that right?

18         MR. SIMPSON:  Yes.

19         THE COURT:  I could understand you might have some

20   arguments on the details of it.  But, big-picture, fairly,

21   someone in his position might argue it's relevant.  Right?

22         MR. SIMPSON:  Yes.

23         THE COURT:  And I gather, although it's very hard for

24   me to determine this, that the subpoena as phrased could call

25   for documents if they existed in Mr. Badolato's possession that

1    would be pertinent to that claim.  Would you agree, Government

2    counsel?

3          MR. SIMPSON:  I think, interpreted broadly and based

4    on the clarification that Mr. Curshen gave at the last hearing,

5    I believe that's correct.

6          THE COURT:  So it seems to me, because the subpoena

7    itself is so difficult to understand, but giving him very much

8    the benefit of the doubt, in particular because he's not here,

9    it seems to me that that subpoena could be boiled down and we

10   could fine-tune it to demand any documents for the period

11   beginning January 1st, 2006, I think --

12         MR. SIMPSON:  2007.

13         THE COURT:  Well, here's the thing.  I'm trying to

14   see -- on page -- on the last page of it, it repeatedly gives a

15   January 1st, 2006, date, but maybe not for every section.

16         MR. SIMPSON:  Well, that's fine.

17         THE COURT:  Okay.  So arguably, any documents that

18   Mr. Badolato has that would show that he or his company

19   received the proceeds of CO2's stock after January 1, 2006,

20   would be responsive to the subpoena, broadly interpreted, and

21   arguably could be relevant to the damages claimed.

22   Mr. O'Donnell or Mr. Simpson, would you agree with that as a

23   general principle?

24         MR. SIMPSON:  Yes, your Honor.

25         THE COURT:  Mr. Badolato, I'm turning back to you now.

1          MR. BADOLATO:  Yeah.  I don't have the copy of

2    Mr. Curshen's response.  But he contradicted himself because

3    kept saying, IBOT, IBOT, IBOT.

4          Any proceeds that we received were from the sale of

5    IBOT, which was the symbol of our company, and the crime that

6    he committed against the company.  So thus, we would receive

7    the proceeds of our own stock.

8          And it was in the years -- I'll have to find that

9    schedule.  I don't have it.  I'll provide it.  But it would be

10   like someone saying at Merrill Lynch that, you know, they

11   called their broker and sold their stock and got a wire

12   transfer and then the firm went out of business or something.

13   He's commingling everything.

14          THE COURT:  Well, I don't understand --

15          MR. BADOLATO:  He's commingling things together.

16   We've never -- myself nor our public company -- we provided him

17   our public shares to sell to finance the company, and he

18   committed a crime with them.  And we received no proceeds.  As

19   a matter of fact, we reported him because we had theft of the

20   shares and did not receive any of the monies.  And that

21   information is publicly available and in our filings.

22          THE COURT:  Let me try --

23          MR. BADOLATO:  The crimes that he committed and the

24   shares that he was provided that in the year 2008 that we

25   received -- nor I -- zero, zero proceeds from that.  As a

```
 1    matter of fact, we reported it as an additional crime, the
 2    theft of this, and we couldn't track it down, and we finally
 3    wrote it off in our accounting statements --
 4              THE COURT:  I have a question.
 5              MR. BADOLATO:  -- and the theft of shares after he was
 6    arrested.  And the firm was raided; and all of those trading
 7    records, internal trading records to his firm, would show, you
 8    know -- you know, would illustrate that.  And we don't have
 9    those.
10              THE COURT:  I understand --
11              MR. BADOLATO:  All I know is we never got the money.
12    It put us out of business.
13              THE COURT:  I'm hearing you clearly that you've been
14    through a lot.  And I'm not unsympathetic to it.  But I'm like
15    a horse with blinders on right now.
16              MR. BADOLATO:  Right.
17              THE COURT:  All I'm trying to do is figure out if you
18    have documents that I have to order you to produce.
19              And so let me try it this way:  Do you have in your
20    possession, custody or control -- that means either in your
21    hand or you have the right to get to it or someone acting on
22    your behalf, like your accountant, for example, or your
23    attorney, for example, kind of your agent -- not your bank.
24    That's not your agent.  That's a third party.
25              But if you or someone who is an agent for you -- do
```

1   you have records as of January 1, 2006, showing that you or

2   your companies received the proceeds of the sale of CO2 Tech

3   stock?

4        MR. BADOLATO:  Absolutely not.

5        THE COURT:  How do you know you don't?  Tell me

6   about -- how do you know that?  Because I don't have yet --

7        MR. BADOLATO:  Well, our company was publicly traded.

8   Its symbol was IBOT.  Any stock that was provided to his firm

9   and custodial accounts were pledged to him to get financing.

10  Any of the funds provided was the sale of our own stock minus

11  his exorbitant fees.

12       So we never owned CO2.  CO2 is a complete separate

13  company.

14       At one time, you know, he probably was dealing with

15  dozens of public companies at one time.  And he's commingling

16  everything.

17       And I could tell by a couple of the statements in that

18  letter and know for a fact that he holds a great deal of ill

19  will, resentment and retribution towards me reporting him for

20  additional crimes in the year 2008 --

21       THE COURT:  Mr. Badolato, that's very common.  So

22  without knowing personally how Mr. Curshen feels, it wouldn't

23  be surprising to me if someone in his shoes felt that way.  But

24  that's not really helpful to me right now.  Remember, I have

25  blinders on.  I'm trying to understand how you can --

```
 1              MR. BADOLATO:  I understand.

 2              Knowing I'm fully under oath, there is no documents in

 3    my possession, nor ever were, nor do I have any knowledge of

 4    the company that I was chairman and CEO of nor myself

 5    personally ever owning, selling or receiving anything to do

 6    with CO2 stock or even knowing about it.

 7              THE COURT:  Is there a way that you could have

 8    received proceeds indirectly?

 9              MR. BADOLATO:  Impossible.

10              THE COURT:  Explain to me why.

11              MR. BADOLATO:  Because any deposit of securities to

12    him of our company, which is the symbol IBOT, which he

13    referenced, shows the sale of the IBOT in the proceeds minus

14    the commissions in what's called a monthly statement, similar

15    to monthly statements that you get from any brokerage firm,

16    that this -- whatever you called it -- on-sign or end-sign

17    or -- what was the name that you referred to that he referred

18    to?

19              MR. SIMPSON:  Eon.

20              MR. O'DONNELL:  Eon.

21              MR. BADOLATO:  Yeah.  Eon or whatever.  That's like

22    their master trading account, where they do all the

23    transactions for all of their customers, and then of course

24    post those to the individual accounts that own it, is what it

25    sounds like.  That's their thing.
```

```
 1            So any securities that we sold -- that the company

 2   sold, of which I was an officer of the company and we hired

 3   him, would be monies from the sale of our securities.

 4            What I'm saying is that in the year 2008 he committed

 5   a crime with those securities, and I reported him for

 6   additional crimes that actually contradict.  I mean, we didn't

 7   bother filing suit because he was arrested and broke.  But we'd

 8   have an outstanding claim, our publicly company and all of the

 9   shareholders, for a minimum of $400,000 plus another two or

10   three million shares that were sold after the Feds raided this

11   account.  There were customers that owned deposit shares with

12   him, shareholders of our company.

13            But unbeknownst to us, we figured that those shares

14   can't be sold.  You know, the Feds raided his account.  His

15   firm's been shut down.

16            THE COURT:  I think you're digressing.

17            MR. BADOLATO:  I'm talking too much.  Sorry.

18            THE COURT:  Let me turn back to the Government

19   counsel.

20            Again, as officers of the Court, knowing I'm trying to

21   resolve this issue in a fair way to Mr. Curshen, not being

22   here, so I'm calling upon you to do more than be an advocate

23   for your own client:  You are very familiar with the scheme

24   that's the subject of the criminal conviction.

25            Am I right on a side question here, the civil lawsuit,
```

```
 1   am I right, is essentially the same scheme that's the subject

 2   of the criminal conviction?  Is that correct?

 3            MR. O'DONNELL:  Yes, your Honor.  Keith O'Donnell.

 4   Yes.  It's a parallel civil suit, and the subject matters

 5   overlap.

 6            THE COURT:  That's, of course, why the Court reached a

 7   finding of summary judgment on liability for -- the preclusive

 8   effect of that criminal judgment.  Right?

 9            MR. O'DONNELL:  Yes, ma'am.

10            THE COURT:  So, being familiar as you are with it,

11   does Mr. Badolato -- can you poke any holes in what

12   Mr. Badolato has just said about how he is so clear that he

13   doesn't have any documents that could show he or his company in

14   the time frame I mentioned received proceeds from the sale of

15   CO2 Tech stock?

16            MR. O'DONNELL:  Your Honor, I can say that what

17   Mr. Badolato said is consistent with what we've found from

18   looking at the information that was obtained from the raid.

19   That basically took a lot of internal documents, computers, and

20   all the material that was seized that gave us sort of a window

21   on how Mr. Curshen's firm operated.

22            THE COURT:  How is it consistent?

23            MR. O'DONNELL:  Well, there are internal Red Sea

24   documents that purport to show how customer funds were

25   allocated through the various transactions.
```

```
 1              And I think the CO2 Tech proceeds are -- you know,

 2    there's a tracking of those proceeds that don't reflect any

 3    money going to Mr. Badolato or IBOT; and there's a separate

 4    sort of accounting for his company's dealings with

 5    Mr. Curshen's firm as well as many others.

 6              And the internal documents are -- you know, they're

 7    account statements issued with the relevant securities and the

 8    sales and how the proceeds were distributed and there are

 9    e-mails requesting wires; and all that is consistent with the

10    idea that IBOT and CO2 Tech were separate transactions done on

11    behalf of separate Red Sea clients.

12              THE COURT:  Is that Mr. O'Donnell speaking?

13              MR. O'DONNELL:  Yes, ma'am.

14              THE COURT:  Okay.

15              MR. O'DONNELL:  Sorry.

16              THE COURT:  I think I've gotten to the bottom line

17    here.  It took me a while.  But I think I've gotten to the

18    bottom line.  And that is, the question to Mr. Badolato, does

19    he have any documents that would show as of January 1, 2006,

20    that he or his company received the proceeds directly or

21    indirectly of the sale of CO2 Tech stock?

22              And Mr. Badolato, being under oath, and I know, having

23    really followed this, and I think you're genuinely, you know,

24    responding to my questions, you've told me unequivocally that

25    there are no such records.  Right?
```

1          MR. BADOLATO:  That is -- absolutely.  Zero.

2          THE COURT:  And Government counsel has told me that

3   Mr. Badolato's explanation for that is consistent with the

4   discovery that you've received in this matter.  Correct?

5          MR. O'DONNELL:  Yes.  Yes, your Honor.  Keith

6   O'Donnell.

7          THE COURT:  So, Mr. O'Donnell, then, making sure I

8   haven't lost my way here, there's not something else I need to

9   cover, certainly the document Mr. Badolato mentioned, the

10  schedule of securities sold by his firm, that's far broader

11  than the subject we've narrowed this down to.  Right?  I don't

12  see how that would be -- that seems to be beyond the scope of

13  relevance that I've determined here.

14         MR. SIMPSON:  This is Mr. Simpson.  I believe that's

15  correct.

16         THE COURT:  Okay.  And so, Mr. Simpson or

17  Mr. O'Donnell, knowing the issues I have before me on this

18  motion for contempt, is there anything else I should be looking

19  at here?  Because we don't really want to do this again.  We

20  want to do this as thoroughly as we can right now.  I'm just

21  asking to elicit your help to see, is there something else I

22  need to check on here or tie off?

23         MR. SIMPSON:  Your Honor, this is Mr. Simpson.  I

24  don't believe that there's anything else.

25         THE COURT:  Okay.

```
 1              MR. SIMPSON:  I believe that if we had had evidence

 2     that Mr. Badolato had received proceeds of CO2 Tech stock, at

 3     the least we would have subpoenaed him ourselves.

 4              MR. BADOLATO:  Oh, yeah.

 5              MR. SIMPSON:  So we don't have any evidence that would

 6     support Mr. Curshen's claim.

 7              THE COURT:  That makes sense.

 8              Mr. Badolato, you had given in your letter back in

 9     February an e-mail address of Andy@AndyBadolato.com and a

10     mobile phone number of (941) 993-0284.  Is that still good

11     contact information for you?

12              MR. BADOLATO:  No, it's not.  My mobile is 882--

13     (941) 882-2710.

14              THE COURT:  2710.  Okay.

15              And the office number, (941) 365-5100:  Has that

16     changed?

17              MR. BADOLATO:  Yeah.  I have a -- kind of a follow-me

18     roaming office number now.  It's (941) 295-7750.

19              THE COURT:  But the e-mail address is still good and

20     the address that I read is -- for your office is still good?

21              MR. BADOLATO:  Yes, ma'am.  It's Suite No. 404.  Did

22     you say 400 or 404?  Because I moved from 400, which was, like,

23     2600 square feet to 800 square feet, Suite 404.

24              THE COURT:  404.  We have that.

25              MR. BADOLATO:  Yes, ma'am.  Okay.
```

1          THE COURT:  So Mr. Badolato, I'm satisfied that -- I'm

2     going to discharge the order to show cause.  I'm going to deny

3     the motion that you be held in contempt and that I'm not going

4     to order that you produce any further documents in response to

5     the subpoena.

6          Having said that, is there anything else that you

7     think I need to address?

8          MR. BADOLATO:  No.

9          THE COURT:  And the same question for the Government.

10         MR. SIMPSON:  No, your Honor.

11         THE COURT:  Thank you all for your patience.  I'm

12    going to get an order out that reflects basically what I've

13    concluded here at the hearing.  And hopefully, that will

14    resolve this matter.  So thank you all.

15         MR. SIMPSON:  Thank you, your Honor.

16         THE COURT:  We're adjourned.

17         (Proceedings concluded.)

18

19

20

21

22

23

24

25

1

C E R T I F I C A T E

2

3          I hereby certify that the foregoing is an

4     accurate transcription of the proceedings in the

5     above-entitled matter.

6

7
                          /s/Lisa Edwards
8     _____      LISA EDWARDS, CRR, RMR
          DATE            Official United States Court Reporter
9                         400 North Miami Avenue, Twelfth Floor
                          Miami, Florida 33128
10                        (305) 523-5499

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25